IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 21, 2016 Session

## IN RE CHRISTIAN P., ET AL.[1]

**Appeal from the Juvenile Court for Hamilton County**
**Nos. 262059, 262060, 262061, 262062, 262063      Robert Philyaw, Judge**

_____

**No. E2015-01860-COA-R3-PT-FILED-JUNE 6, 2016**

_____

This appeal involves the termination of a mother's parental rights to five minor children. Following a bench trial, the trial court found that clear and convincing evidence existed to support the termination of her rights on the statutory ground of the persistence of conditions which led to removal. The court further found that termination was in the best interest of the children. The mother appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and THOMAS R. FRIERSON, II, J., joined.

John Wysong, Cleveland, Tennessee, for the appellant, Melissa P.

Herbert H. Slatery, III, Attorney General and Reporter, and W. Derek Green, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee, Department of Children's Services.

**OPINION**

## I.      BACKGROUND

Christian P., Noah P., Zoe J., and twins, Joshua and Abigail P. (collectively "the Children") were born to Melissa P. ("Mother") in September 2001, June 2004, August 2006, and January 2009, respectively. Mother's oldest child, Kiera J., is not at issue in this appeal. Steve M. was identified as Zoe's father. Phillip P. was identified as the

---

[1] This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties.

father of Christian, Noah, Joshua, and Abigail. Mother lived in Tennessee with the Children and Kiera, while the respective fathers lived elsewhere. The Tennessee Department of Children's Services ("DCS") began providing services to Mother in February 2011 to address various issues in the home. The case was closed after Mother complied with the pertinent requirements.

On November 11, 2011, the Children, along with Kiera, were taken to T.C. Thompson's Children's Hospital, where it was discovered that Joshua and Abigail had been physically abused. Joshua suffered from a punctured jejunum, among other bruising and injuries, while Abigail suffered from a broken femur, among other bruising and injuries that were in different stages of healing. Noah and Christian presented with minor injuries. The cause of all injuries was determined to be blunt force trauma committed by Mother's live-in boyfriend, James S. The Children and Kiera were immediately removed from Mother's care and were later adjudicated as dependent and neglected as a result of the abuse and continuing issues of environmental neglect.

Mother participated in the development of three permanency plans, dated November 22, 2011, July 19, 2012, and May 8, 2014.[2] Mother was required to (1) maintain visitation as permitted by DCS; (2) obtain and maintain a safe, stable residence for six months; (3) maintain a clean home free from bug infestation and clutter; (4) attend domestic violence classes or counseling and sign releases of information; (5) complete a clinical parenting assessment, follow all recommendations, and sign releases of information; (6) participate in individual, group, and family counseling and support groups; (7) obtain and maintain a legal verifiable income; (8) pay child support, if required by the court; and (9) maintain contact with DCS and report changes in residence, phone number, and legal or marital status to DCS. Mother was found to be in substantial compliance in November 2012 and again in May 2013. A trial home placement for Kiera, Christian, Noah, and Zoe was eventually approved in August 2013. Joshua and Abigail were returned home at a later date, and the court approved an extension of the trial placement in November 2013.

On March 4, 2014, DCS reported that Noah, Zoe, Joshua, and Abigail had been removed because Mother was no longer cooperating, had lost her employment, and was in the process of being evicted. Based upon DCS's recommendation, Kiera and Christian were also removed and placed back into foster care. Mother later resumed her cooperative efforts with DCS. However, DCS filed a petition to terminate her parental rights to the Children[3] on August 14, 2014. DCS alleged that termination was supported

---

[2] These plans were ratified by the trial court.

[3] A petition to terminate Mother's parental rights to Kiera, who was 16 years old at the time, was not filed based upon Kiera's indication that she did not wish to be adopted.

by the statutory grounds of failure to provide a suitable home and the persistence of conditions which led to removal.[4]

The hearing on the termination petition was held over the course of several days in March and May 2015. As pertinent to this appeal, Karen Moore, a family services worker employed by DCS, testified that she initially worked with the family in February 2011 to address various issues in the home. She recalled that Mother needed assistance in transitioning some of the children into the Tennessee school system. She stated that workers also advised Mother on how to manage the Children, clean the home, and develop a support system. She provided that that case was closed in June 2011.

Ms. Moore testified that she received a new referral in November 2011 to address physical abuse and environmental neglect. She provided that two of the Children required hospitalization as a result of abuse committed by Mother's boyfriend and that the home was "in very bad shape cleanliness-wise." She recalled that Mother had also failed to follow through with services that had been established during the prior case. She stated that DCS provided a clinical parenting assessment to evaluate Mother's ability to parent and identify training or education that might benefit her. She also scheduled Mother's first individual counseling session once it was determined that Mother no longer held valid insurance. She agreed that Mother regularly attended counseling after the initial session was scheduled.

Ms. Moore acknowledged that Mother was in substantial compliance with the permanency plans. She stated that DCS provided a number of in-home workers to assist Mother and even replaced some workers when it was determined that services were unsuccessful. She believed that Mother showed signs of improvement once Nicole Mitchell was assigned to work with Mother. She believed Ms. Mitchell was a "good fit" for the family. She agreed that Mother consistently maintained employment without assistance from DCS. She claimed that Mother often worked during the nighttime hours, which affected her ability to parent during the daytime.

Ms. Moore testified that Kiera, Christian, Noah, and Zoe were returned to Mother for a trial home placement in August 2013, a few months after in-home services began. She noted that Joshua and Abigail were returned in September 2013. She recalled that the Children were eventually removed because Mother was "completely overwhelmed." She opined that Mother's demeanor and self-confidence diminished quickly with the

_____

[4] DCS also sought termination of Steve and Phillip's parental rights to their respective children. Steve's parental rights to Zoe were terminated based upon his failure to establish paternity. Phillip's parental rights to Christian, Noah, Joshua, and Abigail were terminated based upon the statutory grounds of abandonment for failure to visit and substantial noncompliance with the permanency plans. Neither father appealed the termination decision.

continued presence of the Children. She said that the Children complained of thirst while in Mother's care and that one child suffered from a bladder infection. She believed that Mother showed improvement when the Children were removed. She explained that Mother was able to pay rent, maintain the house, and attend scheduled appointments. She surmised that Mother was simply incapable of parenting the Children and that the conditions in the home had not changed since the time of removal.

Ms. Moore testified that the Children had been placed in good foster homes and had bonded to their respective families. She believed that they required stability and permanency and opined that delaying permanency would be harmful to them.

Haddie Perez-Parra, a family therapist employed by Family Menders, testified that she observed visitation and facilitated parenting skills from March through June 2013. She asserted that Mother completed 6 of the 12 scheduled visits, 2 of which were rescheduled prior to the visit and 4 of which Mother was not present at the scheduled time. She was also present for two child and family team meetings with Mother and a meeting with Mother and her psychologist.

Ms. Perez-Parra testified that Mother was compliant and responsive to her suggestions during visitation. Her observations led her to believe that the Children parented themselves. She attempted to assist Mother in setting rules, identifying consequences, and establishing authority. She noted that Mother's current boyfriend was present for several of the visits. She recalled advising Mother that the boyfriend's presence hindered her ability to demonstrate signs of independence and an improvement in her ability to parent. She recalled that Mother was able to maintain her home at that time but provided that she assisted Mother with meal planning and budgeting issues. She claimed that Mother did not evidence signs of significant improvement in managing the Children by the time the case was transferred in June 2013. She believed that Mother did not possess the cognitive ability to understand what was required to parent six children.

Cheryl Gebelein, also employed by Family Menders, testified that she worked with Mother from June through August 2013. She recalled assisting Mother in establishing age-appropriate discipline, maintaining household organization, and engaging in positive parent-child interactions. She also assisted Mother in her search for daytime employment. She recalled that Mother worked the third shift at a Waffle House.

Ms. Gebelein testified that she did not observe "any major home hazards" but described the home as "cluttered" and "chaotic." She reported that Mother was asleep when she arrived on several occasions and that Mother was not present for two of the scheduled visits. She believed Mother had shown progress but had not met her goals.

Ms. Mitchell, an in-home counselor employed by Camelot Care Centers, testified that she worked with the family from August 2013 through February 2014 while the Children were living with Mother. She provided services for approximately six hours each week. She assisted Mother in maintaining the household, setting a budget, establishing a schedule, and finding employment. She recalled creating a chore chart with age-appropriate chores for each child. She also helped Mother secure resources from different agencies to help her pay rent. She claimed that Mother was able to establish herself as an authority figure with the Children but agreed that there were times when Mother needed assistance. She also acknowledged that there were times when Mother was not present for scheduled appointments. She noted that Mother's cooperation improved when she adjusted the schedule to suit Mother's nighttime working hours. She explained that she scheduled afternoon appointments because Mother rested in the morning upon her return home from work. She characterized the home as "unkempt" and noted that bug infestations occurred from time to time. She worked with Mother to organize the home. Further testimony revealed that recurring bug infestations are a common issue in the public housing complex and that Mother worked with the housing complex to rid the unit of bugs.

Victoria Davidson, a registered play therapist, testified that she initially worked with Noah, Zoe, Joshua, and Abigail to assist them in forming an attachment to the world and the people in their lives. She stated that her work with Noah was unsuccessful because he was in need of a male therapist to address his behavioral problems. She referred him to another therapist but was able to complete 47 sessions with Joshua, 40 sessions with Abigail, and 33 sessions with Zoe since January 2012. She recalled that Mother was present for a few sessions with Zoe and with Abigail and that the girls were "thrilled" that Mother was in attendance. She addressed different issues with each child. Her observations led her to believe that Zoe, Joshua, and Abigail were not attached to Mother and operated independently of her and their siblings. She stated that Joshua exhibited "[e]xtreme behavioral issues" after his last visit with Mother. She recalled that Zoe was "very anxious to please her mother" and routinely engaged in nurturing play, evidencing a desire for a mother figure. She claimed that Abigail had progressed rapidly since her placement in her current foster home and is "very verbal and communicative" and "very happy." She noted that Abigail also began to evidence a bond with Joshua. She believed Zoe, Joshua, and Abigail need consistency and were easily confused by the multiple transitions from placement to placement.

Summer Simmons, an Omni Visions employee, testified that she worked with the Children since May 2014. Her observations led her to believe that the Children had improved in their respective foster families. She explained that Christian had been placed in a different home at his request. She alleged that he engaged in visitation with his siblings on a regular basis and that he is "doing really well" in his current placement and

had bonded to his foster family. She stated that Noah, Zoe, Joshua, and Abigail are also doing well in their current placement and had bonded to their foster family. She believed that returning the Children to Mother would have a negative impact on them.

Relative to Mother, Ms. Simmons testified that Mother was able to parent the Children during visitation. She recalled providing assistance on occasion because "keeping up with everybody can be a challenge for one person." She stated that the Children showed signs of respect toward Mother but that Joshua was particularly defiant toward Mother and other authority figures. She asserted that the Children, especially Joshua, showed signs of regression following a recent visit with Mother.

Vivian Squires, another Omni Visions employee, testified that she worked with Noah, Zoe, Joshua, and Abigail from May 2013 until she was placed on medical leave in April 2014. She returned in June 2014 and began providing services to Noah, who was meeting with a new therapist to address his unique needs.

Ms. Squires testified that she supervised visitations and claimed that the Children were "always excited" to see Mother and opined that the visits went "very well." She also assisted during the trial home placement. She acknowledged that Mother had difficulty managing the Children and had issues with transportation and following through with appointments. She provided that the home was "very dirty" and infested with bugs. She believed that the Children evidenced behavioral issues in school and at home and provided that Joshua had the most difficulty following rules and obeying Mother. She noted that Christian desired placement apart from his siblings. She stated that Kiera often assumed a parental role and parented the Children without supervision. She recalled that Abigail was injured while Kiera was supervising her. She alleged that Mother did not have enough food in the house on two occasions and that some of the Children reported hunger and trouble sleeping. She recalled that some also claimed that Mother's boyfriend played loud music while they were sleeping.

Ms. Squires testified that Omni Visions assisted Mother in remitting payment for rent on occasion. She opined that Mother became overwhelmed and depressed once the Children were returned to her care for the trial home placement. She noticed a marked difference in Mother's appearance and in Mother's overall participation with services during that time.

Anna C. ("Foster Mother") testified that Kiera, Noah, Zoe, Joshua, and Abigail had been placed in her home. She provided that they interacted well with her four children but asserted that some, specifically Noah and Joshua, evidenced signs of aggression and sibling rivalry. She stated that Joshua occasionally hit or kicked his siblings and was very angry. She believed that his behavior had improved until his most

recent visit with Mother. She claimed that he was expelled from school for behavioral issues after the visit.

Foster Mother testified that she and her husband managed a household with nine children by following a routine and maintaining organization. She provided that each child has a particular responsibility and noted that Kiera enjoys cooking and baking. She stated that she also receives assistance from a friend a few days each week to help some of the children with homework. She stated that she takes them on trips and even added an extra row in their vehicle to accommodate them. She expressed care and concern for them and provided that her home was a pre-adoptive placement. She stated that she and her husband were "interested" in adopting Noah, Zoe, Joshua and Abigail but explained that they had not reached a final decision because they did not know which children, if any, might be available for adoption. She also acknowledged that the regressive behavior following the last visitation concerned them.

Georganna Moody, the property manager for Emma Wheeler Homes, testified that Mother has lived in a unit on the property since June 2010. She recalled that Mother had trouble maintaining the cleanliness of her unit. She worked with Mother to remedy the issue and asserted that her last inspection revealed a cluttered but sanitary environment.

Ms. Moody claimed that Mother failed to remit payment for rent and to submit recertification documents in a timely manner. She explained that Mother's rent was commensurate with her income and that the United States Department of Housing and Urban Development required such tenants to submit recertification documents each year or within 10 days of a change in job status or income. She stated that Mother was "consistently late" in remitting rental payments and that she filed a writ of possession against Mother in February 2014 for failure to pay. She recalled that DCS assisted Mother in resolving the issue. She noted that DCS assisted Mother "several times" and that men, including Timothy G., had also remitted payment on her behalf.

Ms. Moody testified that Timothy had been approved as a tenant in Mother's unit within the last three to four weeks. She provided that the lease had not been finalized but stated that he had passed a criminal background check. She recalled that Mother and Timothy reported that they had been robbed at gunpoint on the property. She had been advised that a gun was stolen.

Timothy testified that he was divorced and had fathered two children by two different wives. He also maintained contact with two stepchildren. He said that he had a criminal history and had served approximately two years of a ten-year sentence before he was released on parole and then placed on probation, which he completed in 2005.

Timothy stated that he first met Mother in 2012 and had lived with her for approximately one year. He stated that he felt safe in their housing complex even though Mother had been robbed at gunpoint outside of their apartment and someone had also broken into their apartment. He denied the report that a gun had been stolen from them.

Timothy testified that he is employed and is responsible for remitting child support. He also assists Mother financially and provides money for groceries, rent, clothing, and other items as needed. He claimed that he and Mother are able to pay their monthly expenses with a combined income of approximately $1,200 per month. He stated that Mother usually prepared a meal for dinner and recalled that she also prepared meals for the Children when they were in the home.

Timothy testified concerning his interaction with the Children and Kiera and stated that he "would love to see them come home." He stated that he supervised them while Mother worked at night. He admitted that the house became "chaotic" when they were present but asserted that Mother "handled it the best she could." He stated that Mother attended counseling and opined that she is now "more understanding on how to handle them and how to get their attention" when necessary.

Mother, who was currently incarcerated for failure to pay child support, testified that she was placed into foster care when she was three years old because her stepfather physically abused her. She provided that she was "in and out of foster care" for the majority of her childhood until she finally reached the age of majority.

Mother stated that she first received services from the Florida Department of Children and Families ("DCF") in 2004 based upon allegations of domestic violence and environmental neglect. She explained that Phillip physically abused her and that it was difficult to maintain the house with three kids, Phillip, and various relatives in the home. The case was eventually closed. However, DCF provided services again in 2008 based upon new allegations. She explained that she was on bedrest due to her pregnancy and was unable to clean. She stated that DCF eventually closed the case when Phillip and others helped her maintain the home.

Mother testified that Phillip continued to abuse her until she accepted assistance from a domestic violence center. With funds from the center, she moved to Chattanooga with the Children and Kiera until she secured an apartment in June 2010. She first received services from DCS in 2010 or 2011. She stated that the case was eventually closed as a result of her compliance with the requirements.

Mother acknowledged that the Children and Kiera were removed in November 2011 based upon allegations of severe abuse and continuing issues of environmental

neglect. She stated that her boyfriend, James, physically abused her children. She acknowledged that she visited him in jail after his abusive actions were discovered but explained that he manipulated her and threatened her. Relative to the issues of environmental neglect, she claimed that her "laundry was backed up, [her] washer was broken, and [the children] had school that week." She stated that once the Children and Kiera were removed, she was able to clean her household without assistance because "[t]here was nobody else there in the house but me."

Mother testified that she was compliant with DCS and was even approved to begin a trial home placement. She stated that she was able to provide food and necessities while caring for the Children and Kiera and denied claims that they were sick or injured while in her care. She explained that one child was diagnosed with a bladder infection, likely caused by taking too many baths or drinking too much juice. She acknowledged that Abigail also slipped in the bathtub. She asserted that Kiera was caring for Abigail while she readied herself for work.

Mother acknowledged that the trial home placement ended after she received an eviction notice. She explained that her employer erroneously reported an increase in income, thereby causing an increase in her rental obligation. She stated that she was unable to remit payment at the increased rate. She agreed that she also had difficulty maintaining the house while parenting the Children. She explained that the "first couple of months" were chaotic until they adjusted to the new situation.

Mother believed that she is capable of parenting the Children and denied any claim to the contrary. She explained that raising six children and maintaining a household is difficult but asserted that she had "learned a lot in the past year about me being a parent and not letting them run over me." She claimed to have learned how to adjust her parenting style to suite each child's age and personality. She provided that Timothy and Kiera would also be of assistance in the event that she regained custody. She explained that Kiera often offered her assistance but denied any claim that Kiera assumed a parental role.

Mother agreed that she received a variety of services from DCS and that her caseworkers worked with her on a consistent basis. She asserted that she complied with the requirements in her permanency plans by maintaining consistent visitation, participating in counseling, and completing a parenting assessment and following recommendations.

Relative to child support, Mother testified that she was unsure as to the amount of her responsibility. She explained that she received five different letters with the same amount due listed for each child. She paid one payment but did not understand she was

required to remit the same payment for each child. She asserted that she had the money to remit payment in full when she was arrested. She provided that she had always maintained consistent employment and was currently searching for daytime employment.

Mother acknowledged that the Children had been placed in good homes and that some were approaching their teenage years and would likely have difficulty achieving permanency. She provided that she simply wanted to care for them and was "trying to do everything [she] can to bring them back home."

Following the hearing, the trial court found clear and convincing evidence to support termination based upon the persistence of conditions which led to removal. The court also found clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Children. This timely appeal followed.

## II.  ISSUES

We consolidate and restate the issues raised on appeal as follows:

A.  Whether clear and convincing evidence supports the court's termination based upon the persistence of conditions which led to removal pursuant to Tennessee Code Annotated section 36-1-113(g)(3).

B.  Whether clear and convincing evidence supports the court's finding that termination was in the best interest of the Children pursuant to Tennessee Code Annotated section 36-1-113(i).

## III.  STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

> (1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
>
> (2) [t]hat termination of the parent's or guardian's rights is in the best interest [] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2016, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record

and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, -- S.W.3d --, No. M2014-00453-SC-R11-PT, 2016 WL 819593, at *12 (Tenn. Jan. 29, 2016) (internal citations omitted).

## IV.    DISCUSSION

### A.

Under Tennessee law, a court may terminate parental rights when:

(3)    The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A)    The conditions that led to the child's removal *or other conditions* that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B)    There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C)    The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3) (emphasis added). Termination of parental rights requires clear and convincing evidence of all three factors. *In re Valentine,* 79 S.W.3d at 550. Additionally, the persistence of conditions ground may only be applied "where the

prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *In re Audrey S.*, 182 S.W.3d at 874.

Mother argues that her continued cooperation and substantial compliance belies the court's termination decision. She claims that her home no longer supported a finding of environmental neglect and that she is no longer involved with an abusive boyfriend. She asserts that the court erroneously relied on conditions that were not present at the time of removal and are irrelevant to her ability to parent. DCS agrees that Mother showed improvement before the trial home placement and when the Children were removed but asserts that the trial home placement established her inability to care for herself and the Children at the same time.

We commend Mother for her willingness to work with DCS and her compliance with the responsibilities in her permanency plans. We also do not fault Mother for her choice of nighttime employment, use of public housing, or difficulty in maintaining a home free from clutter with six children. However, the fact remains that she is unable to parent the Children after receiving approximately three years of assistance from DCS in her most recent case. The record reflects that Mother showed signs of improvement before and after the trial home placement but that she was simply "overwhelmed" and unable to care for herself and the Children at the same time. A pattern of compliance with services followed by Mother's inability to parent once the Children are returned or services are discontinued has been evident since 2004. Additionally, the Children have adjusted to their placements and have bonded with their respective families. With all of the above considerations in mind, we conclude that the record supports termination on this statutory ground.

## B.

Having concluded that there was clear and convincing evidence supporting one statutory ground to terminate Mother's parental rights, we must consider whether termination was in the best interest of the Children. In making this determination, we are guided by the following non-exhaustive list of factors:

> (i)    In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:
>
> > (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;[5]

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also

---

[5] *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015) ("[I]n a termination proceeding, the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent.").

stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

A number of the best interest factors weigh against Mother. She had not made the adjustment of circumstances necessary to make it safe and in the Children's best interest to be in her home as evidenced by their removal following the trial home placement. Tenn. Code Ann. § 36-1-113(i)(1). Relative to DCS's efforts, the record was replete with information concerning the effort to assist Mother for several years. Having reviewed the evidence, we conclude that DCS expended more than reasonable efforts in attempting to assist her but that she simply failed to make a lasting adjustment. Tenn. Code Ann. § 36-1-113(i)(2). The record reflects that the younger children operate independently of Mother and do not evidence signs of attachment toward her. Tenn. Code Ann. § 36-1-113(i)(4). The Children reside in safe and stable foster homes. Removing the Children from their homes would negatively affect their emotional and psychological condition as evidenced by their regressive behavior following visitation. Tenn. Code Ann. § 36-1-113(i)(5). Questions remain as to whether the physical environment of Mother's home is healthy or safe as evidenced by the unkempt conditions during the trial home placement. Tenn. Code Ann. § 36-1-113(i)(7).

We acknowledge Mother's love for the Children and her continued effort to achieve compliance. However, the fact remains that she is simply unable to care for herself and the Children at the same time. The Children have simply languished in custody for far too long and should be allowed to achieve permanency and stability in their current placements. The likelihood that the Children will achieve permanency diminishes with each passing year that they wait for Mother to evidence signs of the ability to parent on a long-term basis. With all of the above considerations in mind, we conclude that there was clear and convincing evidence to establish that termination of Mother's parental rights was in the best interest of the Children. We affirm the decision of the trial court.

## V.     CONCLUSION

This judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary.  Costs of the appeal are taxed to the appellant, Melissa P.

_____
JOHN W. McCLARTY, JUDGE